Oren B. Haker, OSB No. 130162
Reed W. Morgan, OSB No. 140664
STOEL RIVES LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

Eric Drew Winston (*pro hac vice pending*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3602
Facsimile: (213) 443-3100

      Attorneys for Plaintiff

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| In re | ) Case No. 14-35284-RLD |
| | ) |
| ALBINA COMMUNITY BANCORP, | ) |
| | ) |
|       Debtor. | ) |
| | ) |
| ———————————————— | ) |
| | ) Adv. No. 15-_____ |
| HILDENE OPPORTUNITIES MASTER | ) |
| FUND, LTD., | ) COMPLAINT |
| | ) |
|       Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BENEFICIAL STATE BANCORP, INC. | ) |
| f/k/a ONE PACIFICCOAST BANCORP, | ) |
| INC.; GRAHAM BRYCE; CHERYL | ) |
| CEBULA; TED GILBERT; JEANA | ) |
| WOOLLEY; SHEILA HOLDEN; | ) |
| MICHAEL POWELL; DUNCAN | ) |
| CAMPBELL; BERNARD FOSTER; AND | ) |
| KAY TORAN, | ) |
| | ) |
|       Defendants. | ) |
| ———————————————— | ) |

  Page 1   -   COMPLAINT

Plaintiff Hildene Opportunities Master Fund, Ltd. ("**Hildene**") for its Complaint against Defendants states as follows:

<u>NATURE OF ACTION</u>

1.      This adversary proceeding seeks redress for the scheme concocted by non-debtor Beneficial State Bancorp ("**Beneficial**"), and facilitated by the individual defendants, to divest debtor Albina Community Bancorp (the "**Debtor**") of substantially all of its assets for virtually no consideration, at a time when the Debtor was insolvent and was left with unreasonably small capital.

2.      This adversary proceeding acknowledges what the Debtor, and parties to the scheme, have failed to acknowledge—that the board of directors for the Debtor (the "**Debtor Board**") acted solely in the interest of Albina Community Bank ("**Albina Bank**"), Beneficial, and themselves to the detriment of the Debtor and its creditors, and that the board of directors for Albina Bank (the "**Bank Board**") disregarded wholly the interests of its sole shareholder, the Debtor.  This contention is not surprising given that many of the members of the Debtor Board were members of the Bank Board.

3.      In so doing, the overlapping members of the Debtor Board and Bank Board intentionally disregarded and breached their fiduciary duties to their shareholder and creditors of the Debtor.

4.      The Boards were not the only participants in the Transaction (defined below).  Beneficial, the recipient and beneficiary of the scheme, willingly assisted the Boards to cause the Debtor to breach its obligations to its creditors.  Beneficial tortiously interfered with an existing contract between the Debtor and its creditors.

 Page 2   -   COMPLAINT

5.      In this case, the creditors of the Debtor were financial creditors who years ago provided critical funding to the Debtor.  As a holding company for Albina Bank's stock, the Debtor had no operations and thus virtually no trade creditors.  The financial creditors held hybrid securities known as trust preferred securities ("**TRUPS**") pursuant to two indentures, with U.S. Bank serving as trustee to the TRUPS holders.  Beneficial tortiously interfered with the TRUPS by inducing the Debtor to sell substantially all of its assets to Beneficial without complying with the TRUPS indentures' successor clauses—clauses that are critical protections for holders of the TRUPS.  The fact that what was actually transferred were, in part, shares of Albina Bank and not shares of the Debtor is irrelevant—the effect was the same: to strip the value of the Debtor to the detriment of the Debtor's creditors and for the benefit of Beneficial.

6.      The structure of the scheme (the "**Transaction**"), and effect of the Transaction on the Debtor, is relatively straightforward:

a.      Prior to October 10, 2013, the Debtor owned 100% of the equity interests (the "**Bank Stock**") in Albina Bank.  As of September 30, 2013, the value of the Bank Stock was at least $4.99 million, as reflected by the "total bank equity capital" in the September 30, 2013, call report prepared by Albina Bank.

b.      The Debtor also owned certain commercial real estate in the Pearl District of Portland, Oregon that housed the headquarters of the Debtor and Albina Bank (the "**Headquarters Building**").  The Headquarters Building is located in an area of Portland that has been increasing in value.

c.      Beneficial and the Debtor's fiduciaries caused Albina Bank to issue new shares of stock directly to Beneficial so that Beneficial would own over 90% of Albina Bank, massively diluting the Debtor's ownership stake.

Page 3   -   COMPLAINT

d. The Debtor received no consideration from the Transaction. Every dollar that Beneficial paid to acquire over 90% of the equity stake in Albina Bank remained with Albina Bank. But the Debtor consented to and facilitated the Transaction.

e. Beneficial and the Debtor's fiduciaries did not stop at massively diluting the Debtor's ownership interest in Albina Bank. They also caused the Debtor to sell to Beneficial the Debtor's Headquarters Building. But for the sale of nearly all of Albina Bank's equity to Beneficial, the latter would not have entered into an agreement to purchase the Headquarters Building from the Debtor.

f. The holders of the TRUPS were protected by two indentures with the Debtor that include a standard "successor" clause—a clause that prohibited the transfer of substantially all of the assets of the Debtor unless the purchaser agreed to assume the obligations to repay the TRUPS.

g. Here, Beneficial did not assume the obligations to repay the TRUPS, and the Transaction was structured in an effort by the parties (including Beneficial, the Bank Board, and the Debtor Board) to avoid triggering the successor clause. In fact, Defendants knew that by engaging in the Transaction, the Debtor would be left with virtually no assets to pay the TRUPS; indeed, they anticipated using the Debtor's lack of assets to force the TRUPS holders to agree to a massive discount.

7. Alternatives to the Transaction existed. The Debtor could have sought to sell Albina Bank, either outside of bankruptcy or in a bankruptcy proceeding, including through a section 363 sale process. But the Debtor did not do so, and apparently did not even consider the option, prior to entering into the Transaction with Beneficial. Numerous other bank holding

companies that issued TRUPS did in fact sell banks in a manner that maximized value for their creditors.

8.      Hildene asserts the TRUPS holders' claim against Beneficial for tortious interference with the indentures.

9.      Hildene also asserts the following derivative claims on behalf of the Debtor's estate:

a.      Actual and constructive fraudulent transfer claims against Beneficial relating to the transfer of the Bank Stock and actual and constructive fraudulent transfer claims relating to the sale of the Headquarters Building;

b.      Breach of fiduciary claims against members of the Debtor Board, some of whom also served on the Bank Board (collectively, the "**Individual Defendants**");

c.      Aiding and abetting breach of fiduciary duty claim against Beneficial; and

d.      A preference claim against Graham Bryce, the former CEO and Chairman of the Debtor, to avoid and recover under 11 U.S.C. §§ 547 and 550 a payment on account of antecedent debt that he received within one year of the Petition Date.

10.     The chart below identifies the claims by Defendant:

| Defendant | Tortious Interference | Breach of Fiduciary Duty | Aiding and Abetting Breach of Fiduciary Duty | Fraudulent Transfer | Preference |
|---|---|---|---|---|---|
| Beneficial | X | | X | X | |
| Graham Bryce | | X | | | X |
| Cheryl Cebula | | X | | | |
| Ted Gilbert | | X | | | |
| Jeana Woolley | | X | | | |
| Sheila Holden | | X | | | |
| Michael Powell | | X | | | |
| Duncan Campbell | | X | | | |
| Bernard Foster | | X | | | |
| Kay Toran | | X | | | |

11.      Beneficial and the Individual Defendants should be held accountable for their misconduct.

12.      Defendant Bryce, who was the principal negotiator for the Debtor and Albina Bank, is the recipient of a preference of nearly $100,000.  Bryce used the Debtor's limited resources to pay himself back pay (above and beyond his regular compensation).

<u>THE PARTIES</u>

13.      Plaintiff Hildene is a holder of capital securities issued by several unmanaged structured financial products known as collateralized debt obligations ("**CDOs**"). Hildene began to acquire its interests in the CDOs in 2009.

 Page 6    -    COMPLAINT

14.     The relevant CDOs are (a) Preferred Term Securities XIV, Ltd. (an exempted company with limited liability under the laws of the Cayman Islands) and Preferred Term Securities XIV, Inc. (a corporation organized under the laws of Delaware); and (b) Preferred Term Securities IX, Ltd. (an exempted company with limited liability under the laws of the Cayman Islands) and Preferred Term Securities IX, Inc. (a corporation organized under the laws of Delaware).

15.     Each CDO issued capital securities pursuant to an indenture.  The Bank of New York Mellon (f/k/a The Bank of New York) serves as trustee for each CDO.

16.     The Debtor issued two sets of TRUPS debentures pursuant to two indentures (the "**TRUPS Indentures**").  Pursuant to the first TRUPS Indenture, dated as of March 26, 2003, the Debtor issued $4,124,000 in TRUPS, maturing in March 2033.[1]  Pursuant to the second TRUPS Indenture, dated as of May 7, 2004, the Debtor issued $2,062,000 in TRUPS, maturing in May 2034.  The indenture trustee for each TRUPS Indenture is U.S. Bank National Association ("**US Bank**").

17.     On March 16, 2015, this Court in the above-captioned chapter 7 case entered its "Stipulated Order Granting Derivative Standing to Investigate and Pursue Possible Claims and Causes of Action Against Beneficial State Bancorp, Inc. and Debtor's Former Directors and Officers" [Docket No. 40] (the "**Derivative Standing Order**").  Pursuant to the Derivative Standing Order, Hildene has standing to pursue any claims the Debtor's estate holds against Beneficial and former directors and officers of the Debtor.

---

[1] The first TRUPS issuance consisted of "Fixed/Floating Rate Junior Subordinated Deferrable Interest Debentures."  The second TRUPS issuance consisted of "Floating Rate Junior Subordinated Deferrable Interest Debentures."

18.     US Bank has assigned to Hildene the claims that US Bank, as TRUPS indenture trustee, holds against Defendants that are asserted herein.

19.     Defendant Beneficial is, on information and belief, a Delaware corporation that is headquartered in Oakland, California.

20.     Defendant Bryce is, on information and belief, a resident of the State of Oregon.  Bryce is the former Chairman and CEO of the Debtor, and was at all relevant times a director of the Debtor and Albina Bank.

21.     Defendant Cheryl Cebula is, on information and belief, a resident of the State of Oregon.  Cebula is an officer of Albina Bank and was at all relevant times a director of the Debtor and Albina Bank.

22.     Defendant Ted Gilbert is, on information and belief, a resident of the State of Oregon, and was at all relevant times a director of the Debtor.

23.     Defendant Jeana Woolley is, on information and belief, a resident of the State of Oregon, and was at all relevant times a director of the Debtor.

24.     Defendant Sheila Holden is, on information and belief, a resident of the State of Oregon, and was at all relevant times a director of the Debtor.

25.     Defendant Michael Powell is, on information and belief, a resident of the State of Oregon, and was at all relevant times a director of the Debtor and Albina Bank.

26.     Defendant Duncan Campbell is, on information and belief, a resident of the State of Oregon, and was at all relevant times a director of the Debtor and Albina Bank.

27.     Defendant Bernard Foster is, on information and belief, a resident of the State of Oregon, and was at all relevant times a director of the Debtor.

28.     Defendant Kay Toran is, on information and belief, a resident of the State of Oregon, and was at all relevant times a director of the Debtor and Albina Bank.

## JURISDICTION AND VENUE

29.     The United States Bankruptcy Court for the District of Oregon has "arising under" and "arising in" jurisdiction pursuant to 28 U.S.C. § 1334(b) and "related to" jurisdiction pursuant to 28 U.S.C. § 1334(b).

30.     This Court has jurisdiction over this adversary proceeding relating to *In re: Albina Community Bancorp*, Case No. 14-35284-RLD, which arises under Chapter 7 of Title 11 of the United States Code, and which is pending in the United States Bankruptcy Court for the District of Oregon in Portland.  Plaintiff consents to entry of final orders and judgment by the this court.

31.     This Court has personal jurisdiction over Beneficial because it conducts substantial business in the State of Oregon and has appeared in this chapter 7 case.

32.     This Court has personal jurisdiction over each of the other Defendants because they are residents of Oregon.

33.     Venue in this Court is proper pursuant to 28 U.S.C. § 1409.

## FACTUAL BACKGROUND

34.     The Debtor formed Albina Bank in 1995 and was, until October 2013, owner of 100% of the Bank Stock.  Albina Bank was at all relevant times an Oregon chartered bank.

35.     Albina Bank is a community development bank serving the Portland, Oregon metropolitan area.  On information and belief, Albina Bank holds itself out as serving traditionally underrepresented communities.

Page 9   -   COMPLAINT

36.     At all relevant times prior to October 2013, there has been substantial overlap between the Debtor Board and the Bank Board.  The chart below reflects the individuals who served on the board of each of the Debtor and Albina Bank in 2012 and 2013.

| Name | Debtor Board Member | Bank Board Member |
|---|---|---|
| Graham Bryce | X | X |
| Cheryl Cebula | X | X |
| Ted Gilbert | X | |
| Jeana Woolley | X | |
| Sheila Holden | X | |
| Michael Powell | X | X |
| Duncan Campbell | X | X |
| Bernie Foster | X | |
| Kay Toran | X | X |

The TRUPS Issuances

37.     On or around October 21, 1996, the Federal Reserve authorized bank holding companies to use TRUPS to raise Tier 1 capital that was required by banking regulators for bank holding companies to run their banking businesses.

38.     Bank holding companies were able to treat TRUPS, which qualify as debt for tax purposes, as Tier 1 capital for bank regulatory purposes, thereby enabling the holding companies to deduct interest payments on the TRUPS while at the same time using the capital raised through the issuance of the TRUPS to satisfy Tier 1 capital requirements.

80170658.4 0056746- 00001

39.     TRUPS thus presented a low-cost alternative to issuing common and/or preferred stock as a way to raise and maintain capital for holding companies and banks.

40.     TRUPS typically have long-dated maturities, which are necessary to satisfy regulatory requirements.  The typical minimum maturity is 30 years.

41.     TRUPS issuers can elect to defer quarterly interest payments for up to 20 consecutive quarters; however, all deferred payments, with accrued interest on those payments, must be paid at the end of the deferral period.

42.     In 2003 and 2004, the Debtor took advantage of the TRUPS financing structure.

43.     Pursuant to the first TRUPS Indenture, dated as of March 26, 2003, the Debtor issued $4,124,000 in TRUPS, maturing in March 2033.

44.     Pursuant to the second TRUPS Indenture, dated as of May 7, 2004, the Debtor issued $2,062,000 in TRUPS, maturing in May 2034.

45.     As part of the TRUPS issuance, and as is typically required for regulatory purposes, the Debtor established two trusts, Albina Statutory Trust I ("**Albina Trust I**") and Albina Statutory Trust II ("**Albina Trust II**"), pursuant to declarations of trust.  Each Albina Trust issued capital securities.  The CDOs acquired and still hold all such capital securities.

46.     Albina Trust I and Albina Trust II, in turn, acquired all of the TRUPS debentures issued by the Debtor pursuant to the TRUPS Indentures.

47.     Further, the Debtor entered into guarantee agreements, with US Bank as guarantee trustee, pursuant to which the Debtor guaranteed the obligations of the Albina Trusts to make payments on account of the Albina Trusts' capital securities to the CDOs.

Page 11   -   COMPLAINT

48.     At all relevant times the Debtor owed and has not paid the principal of, and accrued interest on, the TRUPS.

<u>The TRUPS Indentures' Restrictions on the Disposition of the Debtor's Assets</u>

49.     It was intended that the Debtor, as a bank holding company, would always have available to it at least the equity of its wholly owned subsidiary, Albina Bank, to satisfy and secure repayment obligations under the TRUPS Indentures.

50.     Likewise, to protect holders of the Albina Trusts' capital securities, it was imperative that the TRUPS Indentures expressly require the Debtor to agree that it would not take any action to divorce the payment obligations on the TRUPS from the primary assets that were intended to secure those payments, i.e., the sole ownership of Albina Bank's operating business assets.

51.     Thus, sections 3.7 and 11.1 of the TRUPS Indentures expressly require that, if the Debtor ever were to transfer all or substantially all of its assets, the obligations securing repayment of the TRUPS would become obligations of the successor entity acquiring the assets.

52.     Pursuant to section 5.1(c) of the Indenture, any failure by the Debtor to comply with its express covenant not to transfer all or substantially all of its assets without simultaneously conveying its obligations to repay the TRUPS constitutes an event of default. Thus, if the Debtor were to transfer substantially all of its assets without obtaining assumption of the TRUPS by the asset acquiror(s), the Debtor would be in default under the TRUPS Indentures.

<u>The Debtor's Material Assets Prior to October 2013</u>

53.     Prior to October 2013, the Debtor's primary asset was the Bank Stock, which evidenced equity ownership in Albina Bank. The Debtor owned all of the 100,000 shares

Page 12   -   COMPLAINT

that Albina Bank had issued. As of December 31, 2012, the equity of Albina Bank had a value of at least $4.982 million. As of September 30, 2013, such equity value had increased to $4.99 million.

54. Because the Debtor was merely a bank holding company, any manner of significant disposition, or material dilution, of the Bank Stock necessarily meant that the successor clauses in the TRUPS Indentures would be triggered.

55. The Debtor's other significant asset as of October 2013 was the Headquarters Building, an office building the Debtor owned in fee simple that was located in Portland, Oregon. Albina Bank operated its corporate headquarters in the Headquarters Building and, on information and belief, paid rent to the Debtor. The address of the Headquarters Building is 430 NW Tenth Avenue, Portland, Oregon 97209.

56. As of October 2013, the Headquarters Building was subject to a mortgage securing loans of approximately $2.4 million. The value of the Headquarters Building, if left as a bank building with no other uses, in October 2013 was at least approximately $2.9 million, having increased by nearly $600,000 in one year. However, in late 2013 the Debtor's own representatives believed that the Headquarters Building could be worth substantially more if the building was sold to a third party because of its development potential and its valuable off-street parking.

<u>The Debtor's Regulatory Troubles from 2010 to 2012</u>

57. On March 2, 2010, Albina Bank agreed to a consent order issued by the Federal Deposit Insurance Corporation and the Division of Finance and Corporate Securities of the Oregon Department of Consumer & Business Services requiring Albina Bank to, among

80170658.4 0056746- 00001

other things, increase its Tier 1 capital by such amount as to ensure that its leverage ratio equaled or exceeded 10%.

58.     On November 17, 2010, Albina Bank was issued a Prompt Corrective Action directive by the FDIC directing Albina Bank to raise capital or merge with another institution within certain time periods.

59.     Despite these regulatory actions, by the end of 2012, Albina Bank had returned to profitability, and in 2013 achieved strong core account growth.

60.     Nonetheless, the nearly $5 million in equity in Albina Bank was not sufficient to make the Debtor solvent because the equity in Albina Bank and the value of the Headquarters Building, less the mortgage on the Headquarters Building, was significantly below the total amount owed by the Debtor to satisfy the TRUPS.

61.     In 2012, the Individual Defendants were well aware that millions of dollars were owed to TRUPS holders and that, by September 2013, interest on the TRUPS would become due and payable.  But the Individual Defendants were not concerned with maximizing value for the TRUPS, or even engaging in a dialogue with TRUPS holders.  During that year the Debtor made no effort to engage with US Bank or holders of TRUPS to discuss a path that would maximize the value of the Debtor's assets, such as placing Albina Bank up for auction or filing a bankruptcy proceeding.

62.     Given the Debtor's financial distress, the Debtor should have marketed its assets for auction or in connection with a bankruptcy proceeding to maximize value for its stakeholders.  Had that occurred, the economic beneficiaries of the TRUPS (i.e., the CDOs) likely would have ultimately ended up holding the Debtor's primary assets—the Bank Stock and

Page 14   -   COMPLAINT

the Headquarters Building—or a bankruptcy trustee could have sold such assets, free and clear of the successor clause in the TRUPS Indentures, with all cash proceeds distributed to creditors.

63. According to the Debtor Board minutes for all meetings in 2012, at no time did the Debtor Board discuss the possibility of auctioning Albina Bank to the highest bidder, and at no time did the Debtor Board ever consider a bankruptcy filing to maximize value.

64. The minutes reveal that the Debtor Board never sought, and did not obtain, any legal or financial advice as to the costs and benefits to the Debtor and its creditors if the Debtor auctioned Albina Bank, or commenced a bankruptcy proceeding.

65. Only after the Debtor's fiduciaries negotiated and consummated the Transaction with Beneficial that siphoned away from the Debtor virtually all of the Debtor's assets did the Debtor's fiduciaries consider a bankruptcy filing.

Beneficial and the Individual Defendants Concoct a Scheme to Sell Majority
Control of Albina Bank Without Complying with the Successor Clause

66. Beginning in June 2012, the Debtor purportedly began discussions with Beneficial pursuant to which Beneficial would acquire a substantial control position in Albina Bank and would acquire the Headquarters Building. Beneficial first approached the Debtor, through Bryce, after obtaining Albina Bank's call report from the first quarter of 2012.

67. During the summer of 2012, Beneficial conducted due diligence on Albina Bank and the Headquarters Building. Through this due diligence, on information and belief, Beneficial learned of the Debtor's obligations under the TRUPS Indentures.

68. On June 24, 2012, the Debtor Board conducted an executive session where it was disclosed that Beneficial was interested in investing $7 million to acquire 90% of the stock of Albina Bank. Beneficial also asked that Albina Bank consider selling two underperforming

Page 15  -  COMPLAINT

loans. Bryce informed the other Debtor Board members that the Debtor would need to obtain a "fairness opinion" and that he wanted to have the continuance of Albina Bank's mission statement "written into the transaction" because this "would help with the fairness opinion." Bryce requested authority to negotiate the Transaction, disclosing that shareholders of the Debtor would receive nothing, but "the bank itself would be preserved." The Debtor Board authorized Bryce to negotiate.

69. Bryce continued during this period to focus on using Albina Bank's "mission statement" to justify granting to Beneficial a 90% ownership in Albina Bank. Bryce suggested that to satisfy a "fairness opinion" that "we can show part of the value we received was a continuation of the Mission statement." Bryce was also firm that the Headquarters Building would have to go to Beneficial as part of the Transaction.

70. Strikingly, during this period, in negotiating with Beneficial representatives, Bryce advocated against the economic interests of the Debtor. In one email on September 25, 2012, Bryce wrote to Beneficial's representatives concerning the price to be paid for the Headquarters Building. Bryce stated that Albina Bank could purchase the Headquarters Building for $2.5 million, even though he had "strong reasons to support a market value of $3,000,000 for the property." Bryce also indicated that Albina Bank had $23.049 million in cash, nearly $23 million in short-term securities, and total assets of nearly $124 million. Apart from one loan, all other troubled loans were paying interest currently. Despite these facts, the Individual Defendants did not pursue any transaction that would see the Debtor seek to maximize the value of its assets for its creditors.

71. A few weeks later, Bryce again updated the Debtor Board indicating that he and representatives of Beneficial had met with federal regulators to describe the potential

transaction.  Bryce disclosed that following the Transaction it was likely that the Debtor would file for bankruptcy within two to three years but that he wanted to "get the good-will from the public at this time."

72.     On or about October 10, 2012, Beneficial delivered to the Debtor a letter of intent to acquire 90% of the voting stock of Albina Bank and to acquire the Headquarters Building.  According to minutes of an October 22, 2012 combined meeting of the Debtor Board and the Bank Board, Beneficial offered to acquire 90% of Albina Bank and would invest enough money for Albina Bank's Tier 1 capital to comply with the regulatory consent orders.  Beneficial conditioned its offer on the Headquarters Building being transferred to Albina Bank free and clear of any mortgages.  Bryce disclosed that the Debtor would not be a party to the Transaction, even though the Debtor owned the Headquarters Building and necessarily would have to participate in the Transaction.

73.     One director, Defendant Gilbert, expressly asked whether "there was any way to get something for the TRUPS [or] preferred or common shareholders [of the Debtor]." Bryce stated that preferred and common shareholders were not likely to receive anything, but Bryce ignored the effect on TRUPS holders.

74.     Gilbert then asked whether the Debtor "had any other options and if there was anything else we could do with the holding company asset ([Headquarters Building]) to sell it at a higher price to put more of a 'cushion' at the [Debtor]."  Bryce responded that "we need to get $7MM more to pay off the TRUPS and take care of the common shareholders; [Beneficial] has stated that they are not interested in taking out the TRUPS."  Bryce did not raise, and the Boards did not consider, any alternatives.

Page 17  -  COMPLAINT

75. Even though no counsel was present at the Boards' meeting, Bryce stated that "we will receive advice from counsel to make sure that the directors are protected in this transaction." There was no soliciting of advice on whether the Boards should consider alternatives such as a bankruptcy proceeding.

76. At the meeting, Bryce requested authority to hire an investment banker "to provide a fairness opinion on behalf of the Bancorp," which authority was granted. However, Bryce never actually hired an investment banker for the Debtor, and the Individual Defendants made no effort to cause the Debtor to hire such a professional.

77. On October 23, 2012, Bryce informed Beneficial's representatives that the Debtor Board and the Bank Board had approved the agreement embodied in the letter of intent delivered on October 10. Bryce indicated that he believed that the Debtor would have to become a party to the Transaction. He also indicated that the Debtor would proceed with obtaining a "fairness opinion," though in fact that never happened.

78. On information and belief, on or about November 16, 2012, Albina Bank and Beneficial entered into a non-binding letter of intent ("**LOI**") pursuant to which Beneficial would acquire 90.1% of the equity of Albina Bank and would pay cash as was necessary "to achieve a ratio of Tier [1] capital to total assets of at least 10% immediately following the Investment," which Beneficial estimated to be approximately $8.5 million. Thus, the LOI made clear that Beneficial would not pay the fair value of 90% of equity interests in Albina Bank, but would merely pay whatever cash was necessary to bring Albina Bank into regulatory compliance, irrespective of whether that amount was fair value.

79. The LOI also provided that any definitive documentation would obligate the Debtor and Albina Bank to cease any discussions with, and forbear from initiating any

discussions with, any investors or asset acquirors, subject only to a "fiduciary out" that, if exercised, would obligate Albina Bank to pay a large termination fee to Beneficial.

80.     Even though the LOI was not signed by the Debtor, the LOI required the Debtor to sell the Headquarters Building to Beneficial "for a price not to exceed $2.5 million unencumbered by any mortgage on the building."

81.     The LOI contemplated approval of the Transaction by the Debtor Board, in its capacity as shareholder of Albina Bank.

82.     Albina Bank approved the LOI at a board meeting on November 16, 2012, which board meeting was attended by eight members of the Debtor Board.

83.     The LOI went through several drafts before it was finally executed. Counsel representing Albina Bank regarding the LOI had been counsel to the Debtor when the Debtor and Albina Bank first received the LOI.  Such counsel purportedly resigned as counsel to the Debtor prior to execution of the LOI.  On information and belief, prior to permitting Albina Bank to sign the LOI, the Debtor did not have its own counsel advise the Debtor Board on whether the LOI was in the best interests of the Debtor and its creditors.

84.     The Debtor did not disclose to the TRUPS Indenture trustee or TRUPS holders that it had permitted Albina Bank to enter into the LOI that, among other things, contemplated a 90% dilution of the Debtor's equity interests in Albina Bank or the sale of the Headquarters Building.

85.     By coincidence, on November 20, 2012, Hildene delivered a letter and accompanying memorandum to the Debtor, indicating that it held beneficial interests in the TRUPS and that it invited the Debtor to engage in a discussion regarding the TRUPS in order to restructure the Debtor.  The Debtor never responded.

Page 19   -   COMPLAINT

86.     In January 13, 2013, a combined meeting of the Debtor Board and the Bank Board was conducted to discuss Beneficial's proposed investment.  At the meeting, Bryce stated that Albina Bank would have to be authorized to issue additional shares in order to effectuate the Transaction, which extra shares would require the Debtor's consent.  At Bryce's request, the Debtor Board authorized Albina Bank to issue additional shares.

87.     At the same board meeting, counsel for the Debtor expressly addressed the risk of liability to TRUPS holders.  In subsequent correspondence, the Debtor's counsel specifically indicated that the Transaction could result in a breach of the TRUPS Indentures' successor clause.

88.     There was no discussion of a bankruptcy alternative, or seeking to negotiate with TRUPS holders prior to entering into the Transaction with Beneficial.

89.     On or about January 28, 2013, with the full knowledge and tacit consent of the Debtor, Beneficial and Albina Bank entered into an "investment" agreement (the "**Beneficial Stock Purchase Agreement**"), pursuant to which Albina Bank would issue 911,000 of its shares to Beneficial, equaling 91.1% of the equity interests in Albina Bank, in exchange for a payment to Albina Bank of $8,775,000.  The Transaction share price was $9.63227, but this amount was nothing more than the dollar amount anticipated to achieve Tier 1 capital compliance for Albina Bank.

90.     Per the terms of the Beneficial Stock Purchase Agreement, the Debtor's interest in Albina Bank would be massively diluted, declining from 100% ownership to less than 10% ownership.

91.     Even though the Debtor's ownership interest was being heavily diluted, the Debtor was not a signatory to the Beneficial Stock Purchase Agreement.  Moreover, the

Transaction was intentionally structured in an attempt to avoid needing consent of the Debtor, even though the Debtor was the sole owner of Albina Bank.

92. However, in order to effectuate the Transaction with Beneficial, Albina Bank's Articles of Incorporation had to be amended to provide for the issuance of 1,200,000 shares, instead of 1,000,000 shares. In order to accomplish this act, the Debtor, as the sole shareholder of Albina Bank, had to consent to the amendment to Albina Bank's Articles of Incorporation. Bryce, as the CEO of the Debtor, signed a form of consent dated as of January 28, 2013. Thus, the Debtor had an active involvement to facilitate the massive dilution of its equity interests in Albina Bank, even though it received nothing at a time it was clearly insolvent.

93. The Beneficial Stock Purchase Agreement was negotiated and approved by individuals, as directors and officers of the Debtor, who owed fiduciary duties to the Debtor. Certain such individuals were also members of the Bank Board. The Bank Board owed fiduciary duties of loyalty and care to Albina Bank's sole shareholder, the Debtor.

94. Further, during the negotiations and execution of the Beneficial Stock Purchase Agreement, Cheryl Cebula was the President and CEO of Albina Bank and a director of the Debtor. She owed fiduciary duties to the Debtor. The Beneficial Stock Purchase Agreement made it a condition to Beneficial's performance that Cebula enter into a lucrative employment contract to remain the President and CEO of Albina Bank. Thus Cebula had a direct economic incentive to favor the Transaction at the expense of the Debtor.

95. On information and belief, no board meeting of the Debtor ever was conducted to determine whether it should permit or block its wholly owned subsidiary's Transaction with Beneficial. The Debtor Board did not consider filing for bankruptcy and

80170658.4 0056746- 00001

disposing of its equity interests in Albina Bank through a court-supervised process that would maximize value for the Debtor's creditors.

96.     On information and belief, as of the execution of the Beneficial Stock Purchase Agreement, Beneficial knew of the TRUPS Indentures, including the successor clause. Beneficial knew that by virtue of the Transaction, it would acquire substantially all of the assets of the Debtor, in violation of the TRUPS Indentures' successor clause.

<u>Albina Bank's Financial Advisor and the Debtor's Failure to Engage a Financial Advisor</u>

97.     As set forth above, initially the Debtor planned to engage an investment banker to obtain a "fairness opinion" but in fact never followed through. Thus, no independent professional rendered any opinion as to whether the Beneficial Stock Purchase Agreement was fair to the Debtor.

98.     On information and belief, on November 28, 2012, Albina Bank retained Hovde Securities LLC ("**<u>Hovde</u>**") to act as Albina Bank's financial advisor and to issue an opinion to the Bank Board as to whether the consideration to be paid by Beneficial allegedly would be fair to the shareholders of Albina Bank.

99.     Hovde issued a fairness opinion on January 28, 2013 to Albina Bank concerning the fairness of the $9.63227 per share price. This constituted the purported "fairness" to the Debtor as Albina Bank's sole shareholder. However, since the Debtor was to receive nothing in the Transaction, the share price Hovde opined was fair could not have been fair to the Debtor. Rather, the share price was determined solely as a means of determining the cash amount necessary to bring Albina Bank into compliance with its regulators. Fair value was not driving the Transaction forward.

 Page 22   -   COMPLAINT

100.     At a Bank Board meeting on January 28, 2013, on information and belief, a representative of Hovde represented that the purchase price to be paid to Albina Bank was fair to Albina Bank's shareholders from a financial point of view, even though the Debtor (Albina Bank's sole shareholder) would receive nothing under the Transaction. On information and belief, even though Hovde was supposed to be Albina Bank's financial advisor, Beneficial, as the buyer, paid for the fairness opinion issued by Hovde.

101.     The price per share was not in any way connected to the fair market value of Albina Bank; instead, the "share price" was simply the mathematical result of determining the number of shares necessary to give Beneficial 90.1% of Albina Bank plus the amount of cash necessary to achieve Tier 1 capital compliance. Indeed, shortly before rendering their opinion, Hovde representatives explained that their determination of the price per share was a plain mathematical application. Bryce signed off on this mathematical calculation, necessarily recognizing that the share price Hovde was opining had nothing to do with fair value.

102.     No effort was made to determine the fair value of Albina Bank's equity at the time the Transaction was consummated in October 2013.

103.     After the Beneficial Stock Purchase Agreement was signed, its existence was publicly disclosed, but not its terms.

<u>The Effort to Consummate the Transaction with Beneficial</u>

104.     In early February 2013, Hildene delivered a letter to the Debtor, requesting that the Debtor discuss a restructuring of the Debtor that would preserve beneficial tax attributes. Hildene representatives then exchanged several emails with Bryce, indicating that the Debtor should stop the Transaction and, among other things, consider a bankruptcy filing. Rather than engage in, or even explore, a meaningful restructuring negotiation, the Debtor

Page 23   -   COMPLAINT

representatives informed Hildene that Albina Bank had already entered into a transaction with Beneficial and had received a fairness opinion for it.

105.     Shortly after Hildene delivered its letter and sent emails, Bryce intended to confer with a representative of Beneficial to, on information and belief, discuss liability associated with breaching the TRUPS Indentures.

106.     Bryce also conferred with Debtor's counsel and Albina Bank's counsel, who advised the Debtor that there was a risk that consummating the Transaction with Beneficial would result in a breach of the TRUPS Indentures.

107.     In order to effectuate the Transaction contemplated by the Beneficial Stock Purchase Agreement, Beneficial had to submit an application with the Federal Reserve Bank of San Francisco (the "**Federal Reserve**") to become a bank holding company.  Though the application itself is publicly available, Beneficial did not make publicly available the Beneficial Stock Purchase Agreement.

108.     On March 18, 2013, without the benefit of seeing the Beneficial Stock Purchase Agreement, Hildene delivered a letter to the Federal Reserve, objecting to the Transaction.  Beneficial responded on March 22, 2013, and Hildene replied on March 29, 2013.  On September 25, 2013, the Federal Reserve approved Beneficial's application.  The Federal Reserve pointedly declined to address the merits of the issues Hildene raised because they were not issues for the Federal Reserve to resolve.

109.     The Beneficial Stock Purchase Agreement was consummated on October 10, 2013, when Albina Bank issued a stock certificate to Beneficial indicating that Beneficial was now the owner of 911,000 shares of Albina Bank.  Beneficial publicly announced that the Transaction occurred on October 10, 2013.

110. Even though the Debtor could have stopped the Transaction its wholly owned subsidiary was entering into, the Debtor did not do so, but instead facilitated the Transaction. For example, the Debtor could have refused to execute the consent to the amendment to the Albina Bank's Articles of Incorporation. The Debtor could have marketed the Headquarters Building immediately. The Debtor could have, but chose not to, engage an investment banker to market Albina Bank, whether in or outside of bankruptcy.

111. Once Albina Bank signed the Beneficial Stock Purchase Agreement, given its directors' and officers' conflicts, the Debtor effectively was blocked from considering any alternatives, due to the punitive termination fee imposed by the Beneficial Stock Purchase Agreement. Indeed, when Hildene approached the Debtor to discuss alternatives, the Debtor refused.

112. The Debtor Board members were deeply concerned about their own personal liability, but were provided assurances that Albina Bank's directors and officers insurance policy would be available to protect them. Thus, the Individual Defendants believed they could proceed against the economic interests of the Debtor and its creditors, favoring Beneficial, because they would not face personal liability.

113. As of the consummation of the October 10, 2013 Transaction, Albina Bank had a residual equity value in excess of $4.99 million. Thus, if its equity stake in Albina Bank were sold, it is reasonable to expect that the Debtor would receive at least approximately $4.99 million.

114. The Debtor received _nothing_ from the Beneficial Stock Purchase Agreement.

Page 25  -  COMPLAINT

115.     Had the Transaction been structured as one directly between the Debtor and Beneficial, the Debtor likely would have received at least cash equal to the residual equity. Instead, by manufacturing the Transaction as Albina Bank issuing stock directly to Beneficial, Albina Bank and Beneficial ensured that the Debtor received none of the cash proceeds.

116.     Even though substantially all of the Debtor's assets were effectively being sold, the Beneficial Stock Purchase Agreement did not obligate Beneficial to assume the TRUPS.  The Transaction was structured intentionally to attempt to avoid triggering the successor clause in the TRUPS Indentures, and Beneficial made it clear that it would not assume the Debtor's obligations under the TRUPS Indentures.

117.     Prior to the October 10, 2013 consummation, directors and officers of the Debtor were well aware of when the deferral of interest period on the TRUPS interest would expire, and knew that they could use the deferral of interest period to try to dispose of the Debtor's assets before the Debtor would need funds to pay the interest.

118.     Even though Beneficial filed an application with the Federal Reserve and Hildene objected, on information and belief, the terms of the Transaction were hidden from the Debtor's creditors.

119.     After the Transaction closed on October 10, 2013, Bryce resigned as Albina Bank director and Chairman but continued as Chairman and CEO of the Debtor.

120.     Though the Debtor did not retain a financial advisor to assist it with the negotiations with Beneficial, the Debtor had previously retained Carroll Community Development LLC ("**CCD**") to provide investment banking services, but chose not to use CCD in connection with negotiating with Beneficial.  When the Transaction with Beneficial closed,

Page 26   -   COMPLAINT

CCD demanded a $150,000 fee as payment under a "tail" provision in its engagement agreement with the Debtor.

121.     The Debtor did not make the payment to CCD, but Bryce admitted in an email that CCD should have been paid.  The only reason CCD should have been paid is because the Debtor transferred the Bank Stock.

122.     CCD has filed a proof of claim in the Debtor's chapter 7 case, which claim has not been, and will not be, objected to by Plaintiff or by the Debtor's estate.

<u>Part Two of the Transaction:  the Sale of the Headquarters Building</u>

123.     From the beginning of negotiations with Bryce, Beneficial made it clear that it expected that, as part of Beneficial's acquisition of nearly 91% of the Bank Stock, the Debtor would transfer the Headquarters Building to Albina Bank or Beneficial.

124.     The LOI that Bryce negotiated and Cebula executed obligated the Debtor to sell the Headquarters Building to Albina Bank at a price not to exceed $2.5 million.

125.     Consistent with the LOI, section 5.8 of the Beneficial Stock Purchase Agreement obligated Albina Bank to acquire, on or before the closing date of the Agreement, the Headquarters Building for no more than $2.5 million.  It further obligated Albina Bank to keep Beneficial informed of and approve any sale agreements pertaining to the acquisition of the Headquarters Building.  This provision was damaging to the Debtor because it gave no incentive to Albina Bank to maximize value for its sole shareholder, the Debtor, but instead limited the amount to pay to the Debtor even if the Headquarters Building was worth substantially more than $2.5 million.

126.     In late February 2013, the Debtor indicated to Beneficial that it would sell the building for $2.25 million, and explained that selling it for $2.25 million would assist "with

any potential bankruptcy issues." This position was made even though the LOI indicated that the Headquarters Building could be sold for as much as $2.5 million.

127. Beneficial indicated that it would be amenable to directly purchase the building and then contribute the building as part of a capital contribution to Albina Bank.

128. On information and belief, the Debtor, Albina Bank, and Beneficial then drafted a bill of sale and form of purchase and sale agreement to reflect this arrangement.

129. On March 18, 2013, Albina Bank and Beneficial amended section 5.8 to lower the purchase price to $2.25 million with Beneficial acquiring the Headquarters Building from the Debtor, and further provided that the parties contemplated Beneficial would pay this amount directly to the entity holding a mortgage on the Headquarters Building. The amendment stated that the parties anticipated that Beneficial would complete the acquisition by March 31, 2013, and then lease the Headquarters Building to Albina Bank.

130. The Debtor was not a party to this amendment, but its fiduciaries ensured the sale would proceed. This amendment was signed by Cebula as President and CEO of Albina Bank, while she also served as a director of the Debtor.

131. Contemporaneously, the Debtor Board authorized the Debtor to sell the Headquarters Building directly to Beneficial for $2.25 million. The resolution was signed by Bryce, Cebula, Powell, Campbell, Gilbert, Foster, Holden, and Toran.

132. On information and belief, the Debtor and Beneficial signed a purchase and sale agreement for the Headquarters Building on March 20, 2013.

133. On information and belief, Albina Bank and Beneficial were not able to obtain regulatory approval for Albina Bank to directly acquire the Headquarters Building and

Page 28   -   COMPLAINT

thus agreed to defer the sale until after the Beneficial Stock Purchase Agreement had been consummated.

134.     On October 9, 2013, one day before the Beneficial Stock Purchase Agreement was consummated, Albina Bank and Beneficial entered into a second amendment to the Beneficial Stock Purchase Agreement.  The amendment deleted the obligation to acquire the Headquarters Building.  Again, Cebula executed the amendment on behalf of Albina Bank, but the Debtor was not a signatory.  Cebula was a director of the Debtor as of October 9, 2013.

135.     Even though the second amendment did not obligate Beneficial to acquire the Headquarters Building, on information and belief, it was always the intention of the Individual Defendants and Beneficial to force the Debtor to sell the Headquarters Building to Beneficial, given that Albina Bank used the Headquarters Building for its corporate offices and was obligated to pay rent, and Beneficial did not want a third party to own the real estate.

136.     There was no intention by the Debtor to expose the Headquarters Building to a market test.  Indeed, internal emails in October 2013 make clear that the Debtor never seriously considered any alternative other than to transfer the Headquarters Building to Beneficial.

137.     On October 30, 2013, Bryce arranged for a summary appraisal of the Headquarters Building by engaging Colliers International.  The engagement letter stated that the parties to the engagement were Colliers and Bryce, not the Debtor.

138.     Even though the appraisal was controlled by Bryce, it did reveal that the value of the Headquarters Building had increased to $2.9 million.  On November 22, 2013, Beneficial acknowledged that a "well managed sales effort" could produce a buyer who would offer a price higher than the appraisal and who would have little regard for Albina Bank's

wishes.  Beneficial further acknowledged that the Headquarters Building had development potential, with significant additional value.  Thus, Beneficial knew that it could acquire the Headquarters Building—by far the Debtor's largest asset at that time—for less than what the market likely would bear.

139.    In December 2013, Beneficial sought to proceed with acquiring the Headquarters Building.  Knowing that the Debtor was nearly, if not totally, insolvent, and being well aware of the TRUPS successor clause, Bryce wrote to Beneficial's representatives asking that Beneficial agree to acquire the Headquarters Building along with the remaining 9.9% equity interests in Albina Bank and the tax credit vehicles.

140.    Beneficial declined to acquire all assets, acknowledging that to do so would trigger the successor clause in the TRUPS Indentures.  Beneficial further acknowledged that engaging in successive transactions, close in time, risked having all of the transactions (including the consummation of the Beneficial Stock Purchase Agreement) treated as a single, integrated transaction, which would then mean that the sale of the 90.1% could also be construed as violating the TRUPS Indentures.  But by oral agreement, Beneficial agreed to carry through with what had been intended all along—the purchase of the Headquarters Building and the sale of the remaining Bank Stock.

141.    Thus, the Debtor, its directors and officers, and Beneficial acted collectively to acquire the Headquarters Building and the remaining equity in Albina Bank in piecemeal fashion.  The Debtor Board authorized this process in January 2014.  By this time, the Debtor had already engaged bankruptcy counsel as part of the planning for the inevitable bankruptcy filing.

142. The first step after consummation of the Beneficial Stock Purchase Agreement was to consummate the sale of the Headquarters Building, in a manner similar to that arranged for in March 2013, before the regulators indicated that they would not approve the sale.

143. The Debtor sold the Headquarters Building to Beneficial in February 2014 for $2.881 million. This was higher than what the Debtor had initially contracted in November 2013 because the Debtor obtained the appraisal that indicated that the Headquarters Building had increased in value and was worth at least $2,910,000.

144. Despite obtaining this appraisal, on information and belief, the Debtor made no attempt to market the Headquarters Building or negotiate with Beneficial at arm's-length for a better price, even though Albina Bank had every incentive to pay to retain the Headquarters Building.

145. On information and belief, the Debtor never sought to obtain an updated appraisal as of the February 2014 sale and made no effort to test the market for the Headquarters Building, but instead intended to sell the real property to Beneficial to keep the building in the hands of Albina Bank and away from the Debtor's creditors.

<u>The Second Share Purchase Agreement and Bankruptcy Planning</u>

146. The next step, after consummating the Beneficial Stock Purchase Agreement and the sale of the Headquarters Building, was to transfer to Beneficial the remaining 9.9% equity interest in Albina Bank and sell the value in the tax credits corporate vehicles.

147. The Debtor knew it was hopelessly insolvent and had virtually no assets to pay TRUPS holders, who were due to be paid interest in September 2014. Once it disposed of the remaining 9.9% of the Bank Stock, the Debtor knew it would have to go out of business.

148. Having taken steps to consummate the Transaction, the Debtor began to actively plan for a bankruptcy filing. By no later than May 2014, the Debtor had engaged bankruptcy counsel to advise it when to file and whether to file a chapter 7 or chapter 11 petition.

149. In May 2014, the Debtor Board voted in favor of a bankruptcy petition that would be least harmful to Albina Bank, regardless of the impact on the Debtor's creditors. They also voted to acquire additional directors and officers insurance protection. Bryce even went so far as to suggest changing the Debtor's name to protect Albina Bank (as opposed to offering to sell the name) and, recognizing the adverse impact on TRUPS holders, suggested changing the name of the Debtor to "Hildene Difficulty Corp."

150. Further, by May 2014 Bryce was concerned with his own personal liability because the Debtor had paid him $96,416.67 in March 2014 (with proceeds of the Headquarters Building sale) to satisfy alleged past due employment compensation obligations owed to him by the Debtor.

151. During this period, on information and belief, the Debtor and Beneficial began to plan for the Debtor to sell to Beneficial the remaining 9.9% of the Bank Stock in anticipation of the Debtor filing a bankruptcy petition. The Debtor's directors and officers understood that the value of these shares was depressed due to the fact that it was a minority share interest, but even still would not consider marketing the assets to any true third party.

152. On September 15, 2014—two days before the Debtor filed its chapter 7 petition—the Debtor and Beneficial entered into a "share purchase agreement" (the "**Second Share Purchase Agreement**") pursuant to which Beneficial would pay the same $9.63227 per share to acquire the Debtor's 100,000 shares, for a total consideration of $963,227. The Second Share Purchase Agreement was signed by Bryce, as Chairman of the Debtor Board.

153.     The Debtor made no effort to market its remaining interest in Albina Bank to third parties.  The Debtor always assumed that it would sell the remaining Bank Stock to Beneficial.  The Second Share Purchase Agreement was not negotiated between parties acting at arm's length.

154.     The Second Share Purchase Agreement contained a number of provisions that are adverse to the interests of the Debtor and its stakeholders.

- First, it provided for the purchase price to be reduced by any expenses (including attorneys' fees) Beneficial may incur in the event that the Debtor filed for bankruptcy, including any fees incurred responding to objections to the sale and any fees associated with defending against any claims of other parties.

- Second, a condition to its enforcement was either the TRUPS Indenture trustee consent to the Transaction or a bankruptcy court entering an order approving the Transaction pursuant to 11 U.S.C. § 363(f).  The agreement required either the TRUPS Indenture trustee to waive, or the bankruptcy court to approve a settlement releasing, all claims against Beneficial and its employees, officers, directors, attorneys, and agents in connection with any prior transactions between Beneficial, on the one hand, and the Debtor or Albina Bank, on the other hand.

- Finally, the Transaction required the bankruptcy court to enjoin certain third-party claims.

155.     Though it was subject to conditions before it would become effective, the Second Share Purchase Agreement demonstrated that the Debtor's directors and officers were

Page 33   -   COMPLAINT

more concerned with protecting Albina Bank's mission and obtaining releases of claims against themselves, without regard for whether it was fair to the Debtor's creditors, including TRUPS holders.

156.     Further, while the Second Share Purchase Agreement has not yet been consummated, it demonstrates that nothing prevented the Debtor from directly selling the Bank Stock rather than permitting Albina Bank to issue new shares and circumvent the successor clause of the TRUPS Indentures.

### The Bankruptcy Filing

157.     The Debtor filed a chapter 7 petition on September 17, 2014, which is an event of default under the TRUPS Indentures.  Thus, there have been two events of default under the TRUPS Indentures.

158.     Per the terms of the Derivative Standing Order, Hildene has the estate's standing to investigate and prosecute estate claims against Beneficial and the Individual Defendants.

## **CAUSES OF ACTION**

### COUNT I — TORTIOUS INTERFERENCE WITH EXISTING CONTRACT

159.     Plaintiff hereby repeats and re-alleges each of the paragraphs as though fully set forth here.

160.     A valid and enforceable contractual relationship existed (and still exists) between the Debtor and TRUPS Indenture debenture holders.

161.     The TRUPS Indentures contain a successor clause that provides that if the Debtor transferred substantially all of its assets, it covenants to make the successor obligated

Page 34   -   COMPLAINT

under the TRUPS Indentures. It is a breach of the TRUPS Indentures if the acquiror of substantially all of the Debtor's assets does not assume the TRUPS obligations.

162.    As of October 10, 2013, the primary assets of the Debtor were the 100% ownership of the Bank Stock, listed at a value of $4.99 million on its balance sheet as of September 30, 2013, and the Headquarters Building, with a value of at least $2.9 million.

163.    The Transaction involved a transfer of substantially all of the assets of the Debtor, divided into two steps.

164.    The first step was the consummation of the transfer of 90.1% of the Bank Stock to Beneficial, as set forth in the Beneficial Stock Purchase Agreement.

165.    The Beneficial Stock Purchase Agreement was structured specifically to avoid Beneficial assuming the Debtor's obligations under the TRUPS Indentures.

166.    The second part of the Transaction was the sale of the Headquarters Building to Beneficial. The agreement to sell the Headquarters Building was structured specifically to avoid Beneficial assuming the Debtor's obligations under the TRUPS Indentures.

167.    The Debtor always intended to sell to Beneficial, and Beneficial always intended to acquire (either directly or through Albina Bank), the Headquarters Building as part of the Transaction contemplated by the Beneficial Stock Purchase Agreement.

168.    At all relevant times Beneficial knew that the Debtor had over $7.5 million in TRUPS obligations and that the Debtor had covenanted not to transfer all or substantially all of its assets without ensuring that the acquiror assumed the obligations under the Indentures to repay the TRUPS.

169.    Because each of the Beneficial Stock Purchase Agreement and the sale of the Headquarters Building was structured to avoid the Debtor's TRUPS obligations, Beneficial

knew that the purpose of the Transaction was, and the effect of the Transaction would be, to injure TRUPS holders by preventing them from having the value of the Debtor's material assets to fund repayments to TRUPS holders.

170. Beneficial induced the Debtor and its fiduciaries to permit and facilitate Albina Bank to issue new shares of its stock to dilute the Debtor's ownership from 100% to less than 10%, and then to cause the Debtor to sell the Headquarters Building to Beneficial.

171. Beneficial's improper actions were without privilege and were intended to harm TRUPS holders, and are a significant factor in the Debtor's breach of its contractual obligations to the TRUPS holders.

172. Prior to the consummation of the Beneficial Stock Purchase Agreement, Beneficial had no connection with, no business relationship with, and was not a party to any contract with, the Debtor, Albina Bank, or the TRUPS Indenture.

173. As a direct and proximate result of Beneficial's conduct, Plaintiff has suffered damages in an amount to be determined at trial.

## COUNT II — BREACH OF FIDUCIARY DUTY

174. Plaintiff hereby repeats and re-alleges each of the paragraphs as though fully set forth here.

175. Each Individual Defendant, as director and/or officer of the Debtor and/or member of the Bank Board, owed fiduciary duties to the Debtor, including the duty of loyalty and the duty of care.

176. Such Individual Defendants also owed fiduciary duties to the enterprise as a whole, including creditors of the Debtor by virtue of being in the zone of insolvency at all relevant times.

Page 36  -  COMPLAINT

177. The Individual Defendants made no effort to stop the dilution of the Debtor's equity interests in Albina Bank that would make it impossible for the Debtor to repay the TRUPS. The Individual Defendants instead actively facilitated the Transaction by: (a) negotiating with representatives of Beneficial to structure the Transaction in a manner that harmed the Debtor and its creditors; (b) facilitating the sale of the Headquarters Building in a manner that attempted to avoid compliance with the TRUPS Indentures; and (c) authorizing the Debtor to authorize Albina Bank to issue more shares of stock.

178. The Individual Defendants did not make any effort to inform themselves of alternatives to permitting Beneficial to acquire 90.1% of the equity interests in Albina Bank with the Debtor receiving zero value. Even though it was discussed that the Debtor should engage its own financial advisor to provide a fairness opinion, the Debtor never did. The Debtor Board, through the Individual Defendants, never considered a bankruptcy filing alternative prior to the consummation of the Beneficial Stock Purchase Agreement.

179. Such breaches of fiduciary duties substantially harmed the Debtor and its creditors by making it all but impossible for the Debtor to maximize the value of its assets in a process designed to benefit its creditors.

180. As a direct and proximate result of the Individual Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

<u>COUNT III — AIDING AND ABETTING BREACH OF FIDUCIARY DUTY</u>

181. Plaintiff hereby repeats and re-alleges each of the paragraphs as though fully set forth here.

182. Beneficial had actual knowledge of, and substantially assisted in, the breaches of fiduciary duty by the Individual Defendants. Beneficial substantially assisted by,

80170658.4 0056746- 00001

among other things, (a) encouraging the Individual Defendants to structure the Transaction so that Beneficial could acquire the Bank Stock without paying anything to the Debtor; (b) providing, and making it a condition to the Beneficial Stock Purchase Agreement, that Cebula enter into a lucrative employment contract with Albina Bank once the Transaction had been consummated; (c) paying for Albina Bank's financial advisor; and (d) making it a contractual condition that the Debtor could not market Albina Bank for its own benefit (unless Beneficial obtained a valuable break-up fee).

183. The Individual Defendants could not have damaged the TRUPS holders without the substantial assistance of Beneficial.

184. As a direct and proximate result of Beneficial's aiding and abetting, Plaintiff has suffered damages in an amount to be determined at trial.

COUNT IV — ACTUAL FRAUDULENT TRANSFER UNDER

§§ 548(A)(1)(A), 550, AND 551 (BENEFICIAL)

185. Plaintiff repeats and re-alleges each of the paragraphs as though fully set forth herein.

186. During the two-year period immediately preceding the Petition Date, the Debtor caused the Transaction to occur, which included permitting and facilitating Albina Bank to transfer to Beneficial 90.1% of the Bank Stock, and selling the Headquarters Building to Beneficial.

187. The Debtor entered in the Transaction with the actual intent to hinder, delay, or defraud the Debtor's creditors. This intent is evidenced by:

a. The Debtor and Albina Bank knew that Beneficial would not invest while assuming the TRUPS liabilities;

b.     The Debtor and Albina Bank were well aware of the successor clause and sought to structure the Transaction to avoid having to comply with the TRUPS Indentures;

c.     The Debtor received nothing in exchange for actively facilitating the dilution of 90% of the Bank Stock, including executing a consent to the amendment of Albina Bank's corporate governance documents to cause the issuance of new shares of Bank Stock;

d.     The Debtor hid the details of the Transaction from its creditors;

e.     The Debtor considered, but rejected, engaging its own financial advisor to determine whether the Beneficial Stock Purchase Agreement was fair;

f.     The Debtor made no effort to market the Headquarters Building to maximize value, and was committed only to selling it to Beneficial for Albina Bank's and Beneficial's benefit, knowing that it would likely be selling the real estate for less than market value; and

g.     At all relevant times the Debtor was insolvent and had unreasonably small capital.

188.     At all relevant times hereto, Albina Bank and Beneficial had actual or constructive knowledge that the Transaction hindered, delayed, or defrauded the Debtor's unsecured creditors.

189.     Because the value of the Bank Stock transferred to Beneficial and the purchase and sale of the Headquarters Building are avoidable under the Bankruptcy Code, pursuant to 11 U.S.C. § 550(a)(1), Plaintiff may recover from Beneficial as initial transferee.

Page 39   -   COMPLAINT

## COUNT V — ACTUAL FRAUDULENT TRANSFER UNDER

## §§ 544(b), 550, AND 551 (BENEFICIAL)

190.    Plaintiff repeats and re-alleges each of the paragraphs as though fully set forth herein.

191.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtor.  Section 544(b) permits Plaintiff to assert claims and causes of action that such creditor could assert under applicable state law.

192.    Under ORS 95.230, a transfer is fraudulent as to a creditor, whether such creditor's claim arose before or after the transfer was made, if the debtor made the transfer, whether directly or indirectly, with the actual intent to hinder, delay, or defraud any creditor.

193.    The Beneficial Stock Purchase Agreement and the sale of the Headquarters Building occurred within four years of the Petition Date.

194.    The Debtor entered into the Transaction with the actual intent to hinder, delay, or defraud the Debtor's creditors.  This intent is evidenced by:

a.    The Debtor and Albina Bank knew that Beneficial would not invest while assuming the TRUPS liabilities;

b.    The Debtor and Albina Bank were well aware of the successor clause and sought to structure the Transaction to avoid having to comply with the TRUPS Indentures;

c.    The Debtor received nothing in exchange for actively facilitating the dilution of 90% of the Bank Stock, including executing a consent to the amendment of Albina Bank's corporate governance documents to cause the issuance of new shares of Bank Stock;

80170658.4 0056746- 00001

d.      The Debtor hid the details of the Transaction from its creditors;

e.      The Debtor considered, but rejected, engaging its own financial advisor to determine whether the Beneficial Stock Purchase Agreement was fair;

f.      The Debtor made no effort to market the Headquarters Building to maximize value, and was committed only to selling it to Beneficial for Albina Bank's benefit, knowing that it would be selling the real estate for less than market value; and

g.      At all relevant times the Debtor was insolvent and had unreasonably small capital.

195.     At all relevant times hereto, Albina Bank and Beneficial had actual or constructive knowledge that the Transaction hindered, delayed, or defrauded the Debtor's unsecured creditors.

196.     Because the value of the Bank Stock transferred to Beneficial and the purchase and sale of the Headquarters Building are avoidable under the Bankruptcy Code, pursuant to 11 U.S.C. § 550(a)(1), Plaintiff may recover from Beneficial as initial transferee.

<u>COUNT VI — CONSTRUCTIVE FRAUDULENT TRANSFER UNDER</u>

<u>11 U.S.C. §§ 548(a)(1)(B), 550, AND 551 (BENEFICIAL)</u>

197.     Plaintiff hereby repeats and re-alleges each of the paragraphs as though fully set forth here.

198.     The Debtor indirectly transferred its ownership interest in Albina Bank to Beneficial at a time when it (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining property was unreasonably small capital, and (iii) intended to incur debts beyond its ability to repay them as they matured.

Page 41  -  COMPLAINT

199.    The Debtor received less than reasonably equivalent value in exchange for the dilution of its ownership interest in Albina Bank by virtue of the Beneficial Stock Purchase Agreement.

200.    The Beneficial Stock Purchase Agreement, or at least the transfer of shares of Albina Bank to Beneficial, should be avoided pursuant to 11 U.S.C. § 548(a)(1)(B).

201.    Because the value of the Bank Stock transferred to Beneficial and the purchase and sale of the Headquarters Building are avoidable under the Bankruptcy Code, pursuant to 11 U.S.C. § 550(a)(1), Plaintiff may recover from Beneficial as initial transferee.

## COUNT VII — CONSTRUCTIVE FRAUDULENT TRANSFER UNDER
## 11 U.S.C. §§ 544(b), 550, AND 551

202.    Plaintiff hereby repeats and re-alleges each of the paragraphs as though fully set forth here.

203.    The Debtor indirectly transferred its ownership interest in Albina Bank to Beneficial at a time when it (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining property was unreasonably small capital, and (iii) intended to incur debts beyond its ability to repay them as they matured.

204.    The Debtor received less than reasonably equivalent value in exchange for the dilution of its ownership interest in Albina Bank by virtue of the Beneficial Stock Purchase Agreement.

205.    The value of the Bank Stock transferred to Beneficial and the purchase and sale of the Headquarters Building should be avoided pursuant to 11 U.S.C. § 544(b) and ORS 95.230 and 95.240.

Page 42   -   COMPLAINT

206.     Because the value of the Bank Stock transferred to Beneficial and the purchase and sale of the Headquarters Building are avoidable under the Bankruptcy Code, pursuant to 11 U.S.C. § 550(a)(1), Plaintiff may recover from Beneficial as initial transferee.

### COUNT VIII — PREFERENCE UNDER 11 U.S.C. §§ 547, 550, AND 551 (GRAHAM BRYCE)

207.     Plaintiff hereby repeats and re-alleges each of the paragraphs as though fully set forth here.

208.     Bryce was a senior officer and Chairman of the Debtor Board and is an "insider" as defined under the Bankruptcy Code, and for the purpose of avoiding preferential transfers under 11 U.S.C. § 547.

209.     Bryce received a lump-sum payment of $96,416.70 in March 2014, which is within the one-year period before the Petition Date (the "**Preference Payment**").

210.     The Trustee is entitled to avoid the Preference Payment as a transfer of property of the Debtor:

a.     That was made to Bryce, an insider;

b.     That was made for or on account of an antecedent debt owed by the Debtor before the Preference Payment was made;

c.     That was made while the Debtor was insolvent; and

d.     That enabled Bryce to receive more than he would receive if the case were a case under chapter 7 of the Bankruptcy Code, the Preference Payment had not been made, and he received payment of such debt to the extent provided by the Bankruptcy Code.

Page 43   -   COMPLAINT

211.    Plaintiff, on behalf of the Trustee and for the benefit of the Estate, is entitled to a judgment (a) avoiding the Preference Payment made within one year before the Petition Date under 11 U.S.C. § 547; and (b) recovering the value of the Preference Payment (i.e., not less than $96,416.70) for the benefit of the Estate under 11 U.S.C. § 550.

WHEREFORE, Plaintiff prays as follows:

a.      That the Court enter judgment in favor of Plaintiff and against Beneficial for damages caused by Beneficial's intentional interference with the Debtor's contractual relations;

b.      That the Court enter judgment in favor of Plaintiff and against Beneficial for aiding and abetting breach of fiduciary duty;

c.      That the Court enter judgment in favor of Plaintiff and against Beneficial avoiding as actual fraudulent transfers the value of the transferred Bank Stock and the Headquarters Building to Beneficial;

d.      That the Court enter judgment in favor of Plaintiff and against Beneficial avoiding as constructive fraudulent transfers the value of the transferred Bank Stock and the Headquarters Building to Beneficial;

e.      That the Court enter judgment in favor of Plaintiff and against the Individual Defendants for damages caused by the Individual Defendants' breach of fiduciary duty;

f.      That the Court enter judgment in favor of Plaintiff avoiding and recovering the Preference Payment to Bryce pursuant to 11 U.S.C. §§ 547 and 550 and entering a money award against Bryce in favor of the Estate, by and through the Trustee, in the amount of not less than $96,416.70,

80170658.4 0056746- 00001

together with pre- and post-judgment interest at the maximum legal rate

from the date of the filing of the Complaint, plus costs;

g.     That the Court award Plaintiff any other costs and expenses incurred in

this action, including all legal fees; and

h.     That the Court order such other and further relief as the Court may deem

just and proper.

DATED:  October 1, 2015.

STOEL RIVES LLP


/s/ Oren B. Haker
Oren B. Haker, OSB No. 130162
Reed W. Morgan, OSB No. 140664
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480
oren.haker@stoel.com
reed.morgan@stoel.com

and

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Eric Drew Winston (*pro hac vice pending*)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3602
Facsimile: (213) 443-3100
ericwinston@quinnemanuel.com

Attorneys for Plaintiff

Page 45  -   COMPLAINT